**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MICHALENE PETICCA, | : | Civil No. 1:23-CV-02158 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| THE ROMAN CATHOLIC DIOCESE | : | |
| OF HARRISBURG, | : | |
| | : | |
| Defendant. | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

This matter is before the court on the Motion for Summary Judgment filed by Defendant Roman Catholic Diocese of Harrisburg ("the Diocese").  (Doc. 24.) Plaintiff Michalene Peticca managed one of the Diocese's cemeteries from July 2020 until the Diocese terminated her employment in August 2023.  (Doc. 25-1, ¶¶ 13, 57.)  She alleges that the Diocese withheld overtime wages she earned, retaliated against her for taking Family Medical Leave Act ("FMLA") leave, and unlawfully refused to pay her short-term disability benefits.  (Doc. 1-2, pp. 10–14.) The Diocese moved for summary judgment on all of Peticca's claims.  (Doc. 24, p. 1.)  For the reasons that follow, the court will grant in part and deny in part the Diocese's motion for summary judgment.

1

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**[1]

Peticca worked for the Diocese from December 2017 until August 2023. (Doc. 25-1, ¶¶ 3, 57.)  Peticca started as a cemetery grounds and maintenance worker.  (*Id.* ¶ 3.)  Tom Brlansky supervised Peticca when she worked as a cemetery grounds and maintenance worker for the Diocese.  (*Id.* ¶ 4.)  In that role, Peticca dug graves, ensured that graves were dug accurately and placed in the correct location, placed headstones, cared for cemetery grounds, maintained cemetery equipment, and tamped and seeded graves.  (*Id.* ¶¶ 4–7.)  The Diocese avers that Tom Brlansky instructed Peticca on the "importance of ensuring accurate internments" and taught her how to make grave spaces and place markers. (*Id.* ¶¶ 8–9.)  Peticca denies this and avers that "the training she received from Tom Brlansky was insufficient and ineffective."  (Doc. 30, ¶¶ 8–9.)

In April 2019, the Diocese promoted Peticca to the position of trainee cemetery manager.  (Doc. 25-1, ¶ 10; Doc. 30, ¶ 10.)  The Diocese alleges that it attached the job description for the cemetery manager position to the letter offering Peticca the promotion, which it sent in April 2019.  (Doc. 25-1, ¶¶ 10–11.)  Peticca claims that she did not receive that job description until she requested it in March

---

[1] Many of the facts in this case are not disputed.  Where facts are not disputed, the court cites to the Diocese's statement of material facts, Doc. 25-1, with the implicit recognition that Peticca admitted these facts in her response to the Diocese's statement.  (Doc. 30.)  The court draws all reasonable inferences in favor of the non-movant, Peticca.  *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012).

2023.  (Doc. 30, ¶ 11.)  Tom Brlansky continued to supervise or work alongside Peticca after her promotion to trainee cemetery manager.  (Doc. 25-1, ¶ 12; Doc. 30, ¶ 12.)  While the Diocese claims Tom Brlansky helped Peticca dig graves, place headstones, and complete "the paperwork necessary to complete a person's internment file," Peticca denies that Tom Brlansky worked with her on specific tasks, and she claims that she received "limited training" from him.  (Doc. 25-1, ¶ 12; Doc. 30, ¶ 12.)

In July 2020, the Diocese promoted Peticca again, and she became the cemetery manager for the Gates of Heaven Cemetery.  (Doc. 25-1, ¶ 13.)  Vickie Kollar, the Diocesan Director of Catholic Cemeteries, served as Peticca's direct supervisor.  (Doc. 30, ¶ 13; Doc. 30-2 pp. 8–9.)  Peticca's duties as cemetery manager included, among other responsibilities:

1. Recruiting, hiring, and training employees;

2. Various cemetery administration tasks, such as "[assuring] full compliance with legal and safety requirements, Diocesan policies, and church directives related to cemetery operations," conducting regular staff meetings, analyzing "office and ground activities" and revising "workflow and operational procedures as appropriate," ensuring the "accuracy of all interments, disinterments, and reinterments," and supervising "the preparation of maintenance scheduling for all equipment;" and

3. Several financial duties, such as managing the annual cemetery budget, supervising "procedures for approving bills for payment, purchase orders, and the depositing of funds in bank accounts," and preparing monthly inventory reports for the Diocesan Director of Cemeteries.

(Doc. 25-1, ¶ 20; Doc. 25-2, p. 32; Doc. 30-10, p. 3.)  Peticca asserts that, as cemetery manager, her primary duties were physical tasks, "particularly when [she was] responsible for covering the duties of a Cemetery Maintenance Worker." (Doc. 30. ¶ 18.)  These duties included "digging graves, installing headstones, mowing the lawn, cleaning up trash, and maintaining the physical structure of the cemetery." (*Id.*)  Moreover, Peticca notes that the cemetery manager job description provides that cemetery managers must be able to "undertake the role of maintenance & service as described in the subordinates job description as and when required." (Doc. 25-2, p. 32.)

Tyler Shanabrook and Joseph Brlansky are also Diocese cemetery managers. (Doc. 25-1, ¶ 37.)  Joseph Brlansky testified that undertaking the duties of subordinates could involve physical labor, including digging graves and helping with burials. (Doc. 30-5, pp. 9–10.)  Shanabrook similarly testified that "filling in for a grounds maintenance person" is a primarily physical duty. (Doc. 30-4, p. 9.)  Peticca and the other cemetery managers had weekly calls with Kollar. (Doc. 25-1, ¶ 25.)  Kollar also testified that she routinely visited the Diocese's cemeteries, and that she visited the Gates of Heaven Cemetery at least two to three times between July 2020 and July 2023. (Doc. 30-2, pp. 9–10.)

Peticca received a salary as the cemetery manager. (Doc. 25-1, ¶ 15.)  She had to track her time and submit timesheets, and the Diocese claims that her

timesheets show she worked no more than 40 hours per week.  (*Id.* ¶¶ 16–17.)  But

Peticca avers that Tom Brlansky told her "to fill out her time sheet to reflect a 40-

hour work week regardless of the number of hours worked in a week."  (Doc. 30, ¶

16.)[2]

As cemetery manager, Peticca hired two employees.  (Doc. 25-1, ¶ 21.) One

worked at the Gates of Heaven Cemetery from the fall of 2020 through the fall of

2021.  (*Id.*)  The other worked there from the fall of 2022 through March 2023.

(*Id.*)  The Diocese requested on multiple occasions that Peticca "concentrate on

filling her open positions."  (Doc. 25-1, ¶ 23.)  Peticca claims that she asked Kollar

and Janet Jackson, the Diocese's human resources director, for assistance in hiring

more employees, but neither responded to her requests.  (Doc. 30, ¶ 23.)[3]  Peticca

emphasizes that she "never received a single performance review in her role as

Cemetery Manager" even though the Diocese's employee handbook calls for

annual performance reviews,[4] nor did she receive formal discipline.  (Doc. 30, ¶

---

[2] Peticca offers an example of her underreporting of her work hours; she would "work Saturdays for funeral services which would cause her to work over 40 hours in a work week, but this was not reflected in Peticca's time sheets, as she was trained to complete the time sheet to only reflect a 40-hour work week."  (Doc. 30, ¶ 17.)

[3] Emails between Kollar and Jackson suggest that they were aware of Peticca's requests for help with the hiring process.  (Doc. 30-2, p. 21 (discussing, during Kollar's deposition, an email in which Kollar told Jackson "Michalene was having a fit just yesterday because she wanted this job advertised asap and sent me email after email."))

[4] Kollar testified that performance appraisals were suspended for "two years plus" following the COVID-19 pandemic.  (Doc. 30-2, p. 25.)

27.)  In a 2020 email thread, Kollar and Jackson discussed writing Peticca up for her "consistent insubordination and disrespect."  (Doc. 30-2, p. 2.)  Nonetheless, although Kollar testified that Peticca received some performance reviews during her introductory period as a cemetery manager, between July 2020 and June 2023, Peticca received no performance reviews, performance improvement plans, written discipline, or formal grievances.  (Doc. 30-2, pp. 15, 25.)  Moreover, Peticca claims that the Diocese directed her not to hire more than one employee at a time. (Doc. 30, ¶ 21.)

Both Shanabrook and Joseph Brlansky (Tom Brlansky's son) covered for Peticca at the Gates of Heaven Cemetery more than once before she took a leave of absence in 2023, and Joseph Brlansky once served as Peticca's cemetery manager mentor.  (Doc. 30-5, pp. 16–20.)  While serving as Peticca's mentor in 2020,[5] Joseph Brlansky wrote a letter to Kollar outlining numerous issues with Peticca's performance, including flaws in her grave digging technique.  (Doc. 30-5, pp. 15–18; Doc. 30-6, pp. 2–4.)  The letter noted that Peticca had been corrected for

---

[5] Kollar, Jackson, and Joseph Brlansky gave conflicting accounts of when the events of the letter occurred and when Joseph Brlansky sent the letter to Kollar (Doc. 30-2, p. 18 (displaying Kollar's testimony that Joseph Brlansky wrote the letter in August 2019) (Doc. 30-3, pp. 16–17 (displaying Jackson's testimony that Joseph Brlansky wrote the letter in July of 2020 after mentoring Peticca during her first 30 days as a cemetery manager); (Doc. 30-5, p. 30 (displaying Joseph Brlansky's testimony that he wrote the letter "within a month" of Peticca's promotion to cemetery manager).  Considering each individual's testimony and the fact that the Diocese promoted Peticca to the position of cemetery manager in July 2020, Doc. 25-1, ¶ 13, the court finds, for the purpose of resolving the Diocese's motion, that the events described in the letter occurred, and Joseph Brlansky sent the letter to Kollar, in the summer or early fall of 2020.

incorrectly digging graves at least six times in a year-long period, breaking a vault, failed to use proper slings during a burial, yelling at Joseph Brlansky and calling him incompetent, and failing to incorporate constructive feedback and advice into her work as a cemetery manager.  (Doc. 30-6, pp. 2–4.)  Kollar testified that the Diocese did not discipline Peticca for the mistakes and conduct Joseph Brlansky's letter described, and she suggested that was because Peticca was still in training as a cemetery manager at the time.  (Doc. 30-2, pp. 18, 38.)  Joseph Brlansky testified that, while covering for Peticca before she took leave on a different occasion, he noticed one grave that "looked like a mess" at the Gates of Heaven Cemetery, but did not tell Peticca, Kollar, or Jackson what he saw.  (Doc. 30-5, pp. 21–22.)

On February 11, 2023, Peticca slipped and fell down steps at home.  (Doc. 25-1, ¶ 29.)  On April 28, 2023, she told the Diocese that she had an MRI due to the fall.  (*Id.* ¶ 28.)  Jackson advised Peticca via email that "she was free to set her own work restrictions" and that she should think about her "long term wellbeing." (*Id.* ¶ 31 (quoting Doc. 25-2, p. 50.))  Peticca requested FMLA leave on or about June 12, 2023.  (*Id.* ¶ 33.)  Two days later, Jackson emailed Peticca FMLA paperwork and information about short-term disability (STD) benefits offered by the Diocese.[6]  (*Id.* ¶ 34.)  Peticca claims that, although Jackson sent her "certain

---

[6] The Diocese pays for the short-term disability plan it offers to its employees.  (Doc. 25-1, ¶ 62.)

information regarding STD benefits," she did not "provide any paperwork with respect to [the Diocese's] STD benefit application." (Doc. 30, ¶ 34.) In contrast, Peticca alleges that Jackson "immediately provided Tom Brlansky with STD application paperwork" when he requested a medical leave of absence. (*Id.*) Jackson advised Peticca that STD benefits were available to her. (Doc. 25-1, ¶ 35.)

Shanabrook and Joseph Brlansky covered for Peticca at the Gates of Heaven Cemetery while she was absent due to her medical condition but before she officially requested FMLA leave. (Doc. 30-4, p. 13 (noting that Shanabrook and Brlansky covered for Peticca at the Gates of Heaven Cemetery for "maybe a week or two" before informing Kollar of the issues they discovered there).) Peticca testified that her last day of work at the Gates of Heaven Cemetery building was June 9, 2023. (Doc. 30-1, p. 40.) On June 12, 2023, Peticca emailed Shanabrook and Joseph Brlansky "thanking them for taking over for her at the Gate[s] of Heaven Cemetery and advising them of outstanding items." (Doc. 25-1, ¶ 36.) The Diocese avers that, when Shanabrook and Brlansky arrived at the Gates of Heaven Cemetery to cover for Peticca, they "started to notice various issues that arose with locations of graves and paperwork being either absent or incorrectly filled out." (*Id.* ¶ 40.) Peticca agrees that Shanabrook testified that he first noticed the issues at this time, but she avers that "Joe Brlansky had been aware of issues

with Peticca's performance in the past, and these issues were reported to [Kollar] via email" sometime before November 2020.  (Doc. 30, ¶ 40.)

The Diocese claims that, while they covered for Peticca, Shanabrook and Joseph Brlansky discovered "grave spaces 'way out of whack,'" "gravesites that didn't align with paperwork," "errors," "mistakes," and "damage to things."  (Doc. 25-1, ¶¶ 41–42 (quoting (Doc. 25-2, p. 80.))  The pair also discovered "damage to the building, damage to the company truck, graves in the wrong spot, markers in the wrong location, none of the graves were tamped properly, and invoices that weren't collected."  (*Id.* ¶ 47.)  Peticca claims that she dug the grave spaces properly and according to the training Tom Brlansky provided her.  (Doc. 30, ¶ 41.)  And she reiterates that Joseph Brlansky and the Diocese knew of her performance issues long before he and Shanabrook covered for her.  (*Id.* ¶ 42.)

The Diocese claims that Shanabrook and Joseph Brlansky told Kollar about the concerning condition of the Gates of Heaven Cemetery because they did not want to be "blamed for the situation."  (Doc. 25-1, ¶ 43.)  After Shanabrook and Joseph Brlansky told Kollar about what they discovered while covering for Peticca, Kollar asked Shanabrook and Brlansky to give her "a list of issues they discovered at the Gate of Heaven Cemetery."  (*Id.* ¶ 45.)  Kollar specifically requested this list after she, Shanabrook, and Joseph Brlansky "realized that there were numerous issues with people being buried in the wrong graves, [so] the scope

9

of it could be bigger than what the Diocese realized." (*Id.* ¶ 46.)  Shanabrook and Joseph Brlansky provided their lists, along with "photographic evidence," to Kollar.  (*Id.* ¶ 48.)

Peticca disputes this version of events.  She again denies that it was not until Shanabrook and Joseph Brlansky covered for her that the Diocese learned of the problems at the Gates of Heaven Cemetery, because Joseph Brlansky sent Kollar a letter about those problems years before Peticca took FMLA leave.  (Doc. 30, ¶¶ 40, 46.)  Moreover, Peticca emphasizes that one day after she took FMLA leave, "Kollar mentioned that she wanted to have a meeting to handle the 'mess' at the [Gates of Heaven Cemetery.]"  (*Id.* ¶ 45; Doc. 30-13 p. 3.)  Three days after she requested FMLA leave, Kollar requested that Shanabrook and Joseph Brlansky make a list of issues they found at the Gates of Heaven Cemetery.  (Doc. 30, ¶ 45; Doc. 30-13, p. 2.)  This, she claims, shows that the Diocese scrutinized longstanding performance issues only after she took FMLA leave.  (Doc. 30, ¶ 33.)

Peticca, Kollar, and Jackson met on June 29, 2023, while Peticca was on FMLA leave.  (Doc. 25-1, ¶ 49.)  Jackson and Kollar raised the issues at the Gates of Heaven Cemetery and concerns about Peticca's performance at the meeting. (*Id.* ¶ 50.)  Peticca disputed the Diocese's findings and "contends that she felt the meeting was for nefarious reasons regarding her FMLA leave and disability status."  (*Id.* ¶¶ 49–51; Doc. 30, ¶ 49.)  The Diocese requested a second meeting

with Peticca to discuss its findings and "seek further explanation," but Peticca refused to meet with its representatives.  (*Id.* ¶ 52.)  Peticca claims she did not attend a second meeting with the Diocese because, contrary to the Diocese's stated reason for requesting a second meeting, it truly sought to "terminate Peticca and blame her for the issues at the cemetery that had been evident for years, but only became an issue once it became likely that [she] would be requesting STD benefits."  (Doc. 30, ¶ 52.)

On July 20, 2023, Kollar emailed Jackson and another Diocese employee. (Doc. 30-14, p. 2.)  She wrote:

> After reading the new FMLA paperwork, I think your initial gut feeling was correct—disability is her end game.  Knowing [Peticca], she will twist our dismissal to look like we are on a witch hunt just to avoid paying her while she is injured.  With that being said, the list is so extensive that I feel she would have a very difficult time denying every offence.

(*Id.*)  The Diocese fired Peticca on August 11, 2023.  (Doc. 25-1, ¶ 57.)  In an employee warning form attached to Peticca's termination letter, the Diocese cited the following reasons, among others, as justification for its decision: unreported damage to a company vehicle[7] and premises; failure to mark out and dig graves; incorrect placement of markers; and failure to correctly and timely complete sales

---

[7] Peticca asserts that the Diocese truck was "significantly damaged when Peticca started her position as cemetery manager, making it difficult to tell if any new damage to the truck occurred."  (Doc. 30, ¶ 53.)

contracts.  (Doc. 25-1, ¶ 58; *see* Doc. 25-2, pp. 128–30 (listing additional reasons for terminating Peticca's employment, such as burying an individual in the wrong grave space, incorrectly installing memorials, misaligning graves, incorrectly tamping graves, incorrectly placing vaults in the ground, failing to recruit new employees, exhibiting "a complete disregard of management structures and authority," and deviating from Diocese policy on multiple occasions).)  Peticca asserts that the Diocese failed to follow its employee handbook in terminating her employment without implementing "progressive discipline" beforehand.  (Doc. 30, ¶ 57.)  Moreover, she notes that the Diocese offered Joseph Brlansky multiple performance improvement plans instead of immediately terminating his employment.  (*Id.*)

After it fired her, the Diocese continued to pay Peticca's salary through October 6, 2023.  (Doc. 25-1, ¶ 59.)  It also extended her medical, dental, and vision insurance through October 31, 2023.  (*Id.*)  But only active, full-time employees may receive STD benefits under the Diocese's plan, so Peticca lost eligibility for those benefits when the Diocese fired her.  (*Id.* ¶¶ 60–61.)  Peticca alleges that the Diocese terminated her employment specifically because it sought to prevent her from receiving STD benefits.  (Doc. 30, ¶ 60; Doc. 30-11, pp. 3–4 (containing an email from Jackson to Kollar in which Jackson states that she

12

intends to "finish off [Peticca's] disciplinary documentation/report" and that doing so would "prevent[] [Peticca] from applying for disability").)

The STD plan contains a disclaimer in which the Diocese "reserves the right to amend this plan from time to time," but notes that "any changes will not change the benefits already being received by any employee/claimant." (Doc. 25-2, p. 139.) The Diocese's employee handbook also notes that "the language in this handbook is not intended to create, nor is it to be construed to constitute, a contract between the Diocese of Harrisburg and any one or all of its employees." (*Id.* at 142.)

The Social Security Administration declared Peticca permanently disabled on June 9, 2023. (Doc. 25-1, ¶ 67.) Peticca notes that she did not learn of this determination until the fall of 2024, when the Social Security Administration notified her of her disability date. (Doc. 30, ¶ 67.) She also asserts that the Diocese still has not filled the open cemetery manager position, and that Joseph Brlansky has taken over as manager of the Gates of Heaven Cemetery. (*Id.* ¶ 57.)

Peticca sued the Diocese in the Court of Common Pleas of Dauphin County, Pennsylvania, on December 5, 2023. (Doc. 1-4, pp. 12, 22.) The Diocese removed the case to this court on December 29, 2023. (Doc. 1, p. 1.)

Peticca's complaint contains five counts. (Doc. 1-2, pp. 10–14.) Count One alleges that the Diocese violated the Fair Labor Standards Act, 29 U.S.C. §§ 201–

13

219 ("FLSA"), by intentionally and willfully denying her overtime compensation. (*Id.* at 10.) Count Two alleges that the Diocese also violated the Pennsylvania Minimum Wage Act ("PMWA"), 43 P.S. §§ 333.101–333.115, by denying her overtime compensation. (*Id.* at 11.) Count Three alleges that the Diocese violated the FMLA, 29 U.S.C. §§ 2601–2654, because it terminated her employment based on "wholly pretextual reasons" and "similarly situated employees who had not taken an FMLA leave of absence were treated more favorably than [Peticca]." (*Id.* at 11–12.) Count Four raises a breach of contract claim against the Diocese; it alleges that the Diocese breached the "unilateral contract" created by its STD benefits plan by terminating her employment and denying her benefits. (*Id.* at 12–13.) Finally, Count Five alleges that the Diocese violated the Pennsylvania Wage Payment and Collection Law, ("WPCL"), 43 P.S. §§ 260.1–260.45, by denying her STD benefits. (*Id.* at 13–14.)

The Diocese filed an answer to Peticca's complaint on January 4, 2024. (Doc. 2.) On June 13, 2025, the Diocese filed its motion for summary judgment, an accompanying brief in support, and a statement of material facts. (Docs. 24, 25, 25-1.) Therein, it moves for summary judgment on all claims raised in Peticca's complaint. (Doc. 24, p. 1.) Peticca filed a brief in opposition, Doc. 26, and an answer to the Diocese's statement of material facts. (Doc. 30.) The Diocese filed

14

a reply.  (Doc. 31.)  Therefore, the Diocese's motion for summary judgment is ripe

for disposition.

## JURISDICTION AND VENUE

This court has jurisdiction under 28 U.S.C. § 1331 because Peticca brings

claims arising under federal statutes.  The court also has supplemental jurisdiction

over Peticca's state law claims pursuant to 28 U.S.C. § 1367(a) because they are

related to Peticca's federal claims.  Venue is appropriate under 28 U.S.C. § 1391

because all actions or omissions alleged in Peticca's complaint occurred in the

Middle District of Pennsylvania.

## STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is material if resolution of

the dispute "might affect the outcome of the suit under the governing law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is

not precluded by "[f]actual disputes that are irrelevant or unnecessary."  *Id.*  "A

dispute is genuine if a reasonable trier-of-fact could find in favor of the

nonmovant' and 'material if it could affect the outcome of the case."  *Lichtenstein*

*v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

15

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)).  The court may not "weigh the evidence" or "determine the truth of the matter." *Anderson*, 477 U.S. at 249.  Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial.  Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

16

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

The Diocese argues that it is entitled to summary judgment on every claim. (Doc. 24, p. 1.) Peticca contends that summary judgment is inappropriate because there are disputed issues of material fact on every claim. (Doc. 26, pp. 6–25.) The court addresses Peticca's claims and the parties' arguments in turn.

### A. FLSA and PMWA claims

Peticca alleges that the Diocese violated the FLSA and the PMWA by failing to pay her overtime wages when she worked more than 40 hours per week. (Doc. 1-2, pp. 10–11.) "Because of the similarities between the PMWA and the FLSA, Pennsylvania courts analyze overtime and minimum wage violations of the PMWA and the FLSA under the same framework." *Bansept v. G & M Auto.*, 434

17

F. Supp. 3d 253, 258 (E.D. Pa. 2020) (citing *Bedolla v. Brandolini*, No. 18-146, 2018 WL 2291117, at *4 (E.D. Pa. May 18, 2018); *Razak v. Uber Techs., Inc.*, No. 16-573, 2016 WL 5874822, at *7 (E.D. Pa. Oct. 7, 2016)).  The FLSA requires employers to "pay their employees at least a specified minimum hourly wage for work performed and to pay one and one-half times the employee's regular rate of pay for hours worked in excess of forty hours per week."  *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 306 (3d Cir. 2003) (internal citations omitted) (citing 29 U.S.C. §§ 206, 207).  The PMWA requires the same.  43 P.S. § 333.104(a)–(c).

Both the FLSA and the PMWA exempt employees "employed in a bona fide executive, administrative, or professional capacity . . ." from minimum wage and overtime pay requirements.  29 U.S.C. § 213(a)(1); 43 P.S. § 333.105(a)(5).[8]  The Diocese argues that as a cemetery manager, Peticca qualified as an administrative employee and was therefore not entitled to overtime pay pursuant to the administrative exemption.  (Doc. 25, p. 15.)

---

[8] Courts analyze the PMWA and FLSA's administrative exemptions together, and because the parties do not dispute this approach or suggest a relevant difference between the two statutes, the court will do the same.  *See Baum v. Astrazeneca LP*, 372 F. App'x 246, 248 n.4 (3d Cir. 2010) (citing federal regulations when analyzing a PMWA administrative exemption act issue because "Pennsylvania courts have looked to federal law regarding the Fair Labor Standards Act ("FLSA") for guidance in applying the PMWA") (citing *Commonwealth of Pa. Dept. of Labor & Indus., Bureau of Labor Law Compliance v. Stuber,* 822 A.2d 870, 873 (Pa. Commw. Ct. 2003), *aff'd*, 859 A.2d 1253 (Pa. 2004)); *Brown v. Meadows at E. Mountain-Barre for Nursing & Rehab. LLC*, No. 3:22-CV-00828, 2024 WL 1916713, at *3 n.9 (M.D. Pa. May 1, 2024) (noting that the only difference between the PMWA and FLSA's executive exemptions "apparent to the Court . . . implicates the compensation factor").  Thus, the court refers to both the FLSA and PMWA statutory exemption for administrative employees together as "the administrative exemption."

The Department of Labor's regulations clarify that an "employee employed in a bona fide administrative capacity" is an employee (1) who is compensated at a specific salary level; (2) "[w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) "Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a); 34 Pa. Code § 231.83 (providing an almost identical definition); *Clark v. Delaware Valley Sch.*, 450 F. Supp. 3d 551, 563 (M.D. Pa. 2020) (citing 29 C.F.R. § 541.200(a)).  Within that definition, "the term 'primary duty' means the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  "Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."  *Id.*; *see O'Bryant v. City of Reading*, 197 F. App'x 134, 136–37 (3d Cir. 2006).

The employer bears the burden of proving that an employee works in a bona fide administrative capacity and is therefore exempt from the FLSA and PMWA's requirements "with no entitlement to overtime pay . . . ."  *Thomas v. Teksystems, Inc.*, No. 2:21-CV-460, 2026 WL 381239, at *4 (W.D. Pa. Feb. 11, 2026) (quoting *Gillott v. Powerex, Inc.*, 904 F. Supp. 442, 446–47 (W.D. Pa. 1995)); *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 900 (3d Cir. 1991) ("The burden of

19

proving [the exemptions from the FLSA's overtime requirements listed in 29 U.S.C. § 213(a)(1)] is upon the employer . . .") (citing *Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 206 (1966)).  "The question whether an employee is exempt is a mixed question of law and fact."  *Clark*, 450 F. Supp. 3d at 564 (citing *Pignataro v. Port Auth. of N.Y. & N.J.*, 593 F.3d 265, 268 (3d Cir. 2010)).

Accordingly, to prove that Peticca's cemetery manager position qualified for the administrative exemption and she is not entitled to overtime pay, the Diocese must show that: (1) her salaried compensation met specific benchmarks set by federal and state regulations; (2) her "primary duty" as cemetery manager was "the performance of office or non-manual work directly related to the management or general business operations of [the Diocese] or [the Diocese's] customers"; and (3) that primary duty included "the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a)(1)–(3); 34 Pa. Code § 231.83.

Peticca does not dispute that the Diocese proved the first and third factors, so the court assumes without deciding that those factors are satisfied for the purpose of deciding the Diocese's motion for summary judgment.  (Doc. 26, pp. 13–16); *see Brown*, 2024 WL 1916713, at *3 n.9 (noting that, because the parties did not dispute the salary factor of the executive exemption to the FLSA and PMWA's overtime requirements in their briefing, "the Court will decline to opine

20

on whether this factor is satisfied at this time").  Instead, the parties' arguments focus on the second factor–whether Peticca's primary duty as cemetery manager was "the performance of office or non-manual work directly related to the management or general business operations of [the Diocese] or [the Diocese's] customers."  29 C.F.R. § 541.200(a)(2); (Doc. 25 pp. 15–18); (Doc. 26, pp. 13–16); (Doc. 31, pp. 2–3.)

The Diocese contends that Peticca's duties as cemetery manager included personnel management, cemetery administration, and financial responsibilities.[9] (Doc. 25, p. 15.)  It acknowledges that Peticca may have performed some "nonexempt, physical work" as a cemetery manager.  (*Id.*)  But it claims her "primary duty" was to complete administrative and managerial tasks.  (*Id.* at 15–16.)  The Diocese also argues that Peticca had to spend time doing nonexempt work because she did not hire enough cemetery maintenance workers.  (*Id.* at 17.)

---

[9] An employee performs work "directly related to the management or general business operations" of the employer when that work is "directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  29 C.F.R. § 541.201(a); *see also* 34 Pa. Code § 231.83(1)(i).  Both Federal and Pennsylvania regulations give the following examples of work directly related to management or general business operations:

> [T]ax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance . . .

34 Pa. Code § 231.83(1)(i); 29 C.F.R. § 541.201(b).

Accordingly, it claims that Peticca "cannot seek to thwart the exemption through her own failure to perform her managerial duties." (*Id.* at 17–18.)

In response, Peticca avers that she spent significant time doing "physical labor, such as digging graves, installing headstones, mowing the lawn, cleaning up trash, and taking care of the cemetery grounds" as cemetery manager. (Doc. 26, p. 15.) Peticca relies on a Pennsylvania regulation which states that an employee who spends more than 20 percent of their time during a work week completing non-administrative tasks does not qualify for the PMWA's administrative exemption. (*Id.* at 14–15.)[10]  She argues that the testimony of Joseph Brlansky, Shanabrook, and herself about their work as cemetery managers, and the cemetery manager job description provided by the Diocese, create a dispute of material fact about the nature of her primary duty as cemetery manager. (*Id.* at 15–16.)  She also argues that any clerical work she performed does not qualify as an administrative or exempt task. (*Id.* at 15.)

_____

[10] Peticca urges the court to resolve the primary duty question using a Pennsylvania regulation that purportedly states that an employee in an administrative capacity "does not devote more than 20% of time worked in a workweek, or, in the case of an employee of a retail or service establishment, who does not devote more than 40% of time worked in the workweek to activities which are not directly and closely related to the performance of [administrative tasks]." (Doc. 26, pp. 14–15 (citing 34 Pa. Code § 231.83(1)–(4).)  But the Pennsylvania Department of Labor and Industry amended that regulation in 2020, and the current version does not include the time percentage language on which Peticca relies. 34 Pa. Code § 231.83. Peticca argues that the earlier version of the regulation is controlling here because she was appointed to the position of cemetery manager before the amendment. (Doc. 26, p. 15 n.2.)  Peticca does not cite any authority in support of this timing argument.  The court does not determine in this memorandum whether the earlier version of the Pennsylvania regulation applies in this case.

In reply, the Diocese reiterates its argument that Peticca had to perform nonexempt work because she failed to hire additional employees, and she "must not now be permitted to use her past performance failures to evade the administrative exemption." (Doc. 31, pp. 2–3.) It again emphasizes that her duties as cemetery manager were administrative, so she is not entitled to overtime compensation. (*Id.*)

The court will deny the Diocese's motion for summary judgment on Peticca's FLSA and PMWA claims. The parties do not meaningfully dispute that Peticca performed a mix of administrative (exempt) and physical or manual (non-exempt) work as cemetery manager. *See* 29 C.F.R. § 541.200(a)(2) (differentiating administrative work from non-administrative work); (Doc. 25, pp. 16–18; Doc. 26, pp. 13–16.) Instead, they disagree over which type of task made up her "primary duty" as cemetery manager. (Doc. 25, p. 18; Doc. 26, p. 16.)

Federal regulations clarify that an employee's primary duty is "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). The amount of time an employee spends doing exempt and non-exempt work "can be a useful guide in determining whether exempt work is the primary duty of an employee," but "[t]ime alone . . . is not the sole test." *Id.* § 541.700(b). The relevant factors include:

> The relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the

23

> employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id.* § 541.700(a).  Examining these factors based on the record before the court, disputes of material fact remain that preclude summary judgment on the question of Peticca's primary duty as cemetery manager.  The job description for the position specifically requires the cemetery manager to "be able to undertake the role of maintenance & service as described in the subordinates job description as and when required."  (Doc. 25-2, p. 32.)  Joseph Brlansky testified that undertaking the duties of subordinates could involve physical labor, including digging graves and helping with burials.  Shanabrook agreed that "filling in for a grounds maintenance person" is a primarily physical duty.  (Doc. 30-4, p. 9.)  This evidence could establish that some physical, nonexempt work is an inherent part of the cemetery manager's duties, and neither the Diocese nor Peticca points to specific evidence—other than Peticca's own testimony—that indicates how much of Peticca's work as a cemetery manager included these non-exempt tasks as opposed to administrative tasks.  (*See* Doc. 25, pp. 15–18; Doc. 25-1, ¶¶ 13–27; Doc. 30, ¶ 15; Doc. 26, pp. 15–16); *Clark*, 450 F. Supp. 3d at 565 (noting that neither party offered "evidence of the percentage of time the plaintiffs spent doing the various tasks" even though, pursuant to 29 C.F.R. § 541.700(b), the amount of time spent on specific tasks can be a "useful guide" in the primary duty inquiry).

Moreover, the fact that the Diocese ultimately terminated Peticca in part because she failed to complete physical tasks like keeping up with cemetery maintenance and incorrectly digging graves suggests that these were important responsibilities.  *See In re Enter. Rent-A-Car Wage & Hour Emp. Pracs. Litig.*, 2012 WL 3928278, at *12, *17 (finding that a reasonable juror could conclude that the plaintiff's non-exempt duties were more important than his exempt duties, suggesting that his position did not qualify for the FLSA's executive or administrative exemptions from overtime requirements because his primary duty was not managerial or administrative); *Clark*, 450 F. Supp. 3d at 565 ("An appropriate inquiry is to examine the [employees'] primary value to the [employer]") (citing *Ferrell v. Gwinnett Cty. Bd. of Educ.*, 481 F. Supp. 2d 1338, 1344 (N.D. Ga. 2007)).  And the record does not provide a clear comparison between Peticca's salary and the earnings of cemetery maintenance employees at the Diocese who performed the same non-exempt work she did.  *See, e.g., Itterly v. Family Dollar Stores, Inc.*, 606 F. App'x 643, 648 (3d Cir. 2015) (relying in part on a comparison between the plaintiff's salary and the wages of nonexempt employees to determine the plaintiff's primary duty).

Accordingly, genuine disputes of material fact about Peticca's primary duty remain.  The court's conclusion on this point is not changed by the Diocese's argument that Peticca had to perform nonexempt tasks because she failed to hire

employees.  (Doc. 25, p. 17.)[11]  That argument injects an additional element of causation into the primary duty inquiry that is not present in Department of Labor regulations, and the Diocese recognizes that the United States Court of Appeals for the Third Circuit has not "directly addressed" the issue.  *Itterly*, 606 Fed. App'x. at 646 (citing 29 C.F.R. § 541.700(a)); (Doc. 25, p. 17.)  Even if the court were to accept the Diocese's causation argument, however, disputed material facts preclude it from granting the Diocese's motion for summary judgment on its basis.  Peticca claims that she failed to hire additional employees in part because she lacked necessary help from Jackson and Kollar, and the record indicates that Jackson and Kollar knew about her requests for help.  Therefore, the court will deny the Diocese's motion for summary judgment on Peticca's FLSA and PMWA claims.

## B.  FMLA retaliation claim

Peticca claims the Diocese fired her because she took FMLA leave.  (Doc. 1-2. pp. 11–12.)  Accordingly, she raises an FMLA retaliation claim against the Diocese.  (*Id.*)

---

[11] The court's conclusion is also not impacted by the Diocese's argument that Peticca "admitted that virtually all her job responsibilities were managerial in nature," and this "admi[ssion]" demonstrated that her position qualified for the administrative exemption. (Doc. 25, p. 15; Doc. 31, p. 3.)  That is because the question of whether a specific position qualifies for the administrative exemption is as mixed question of law and fact, so Peticca's opinion about her job responsibilities is not dispositive.  *Clark*, 450 F. Supp. 3d at 564 (citing *Pignataro*, 593 F.3d at 268).

The FMLA permits employees to take leave for medical reasons, and "[e]mployers may not interfere with or retaliate against employees for invoking their FMLA rights . . . ." *Walker v. Se. Pa. Transp. Auth.*, No. 24-2275, 2025 WL 1879521, at *2 (3d Cir. July 8, 2025) (citing *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 509 (3d Cir. 2009)). When an FMLA retaliation claim is based on circumstantial evidence, the court applies the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973). *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 256 (3d Cir. 2014) (citing *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012)). Thus, to succeed on her retaliation claim, Peticca must establish that "(1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." *Id.* (quoting *Lichtenstein*, 691 F.3d at 302). If she establishes a prima facie retaliation claim,[12] "the burden shifts to [the Diocese] to provide evidence of a legitimate non-discriminatory reason" for terminating her employment. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802). If the Diocese meets this "minimal burden," Peticca

---

[12] The burden of establishing a *prima facie* claim under the *McDonnell Douglas* framework "is not intended to be onerous." *Suarez v. Pa. Hosp. of Univ. of Pa. Health Sys.*, No. CV 18-1596, 2018 WL 6249711, at *5 (E.D. Pa. Nov. 29, 2018) (citing *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 271 (3d Cir. 2010)).

"must then point to some evidence that [the Diocese's] reasons for the adverse action are pretextual." *Id.* (quoting *Lichtenstein*, 691 F.3d at 302).

### 1. Prima facie case of FMLA retaliation

Peticca must establish a prima facie case of FMLA retaliation to satisfy the first *McDonnell Douglas* step, and the court finds that she has. *Id.* The Diocese concedes that Peticca invoked her right to FMLA leave and later suffered an adverse employment action. (Doc. 25, p. 19.) That leaves causation as the only disputed element of Peticca's FMLA retaliation claim. (*See id.*) "The ultimate question with respect to causation in an FMLA retaliation case is whether FMLA-qualifying leave was a 'negative factor' that hastened a plaintiff's termination." *Caplan v. L Brands/Victoria's Secret Stores, LLC*, 210 F. Supp. 3d 744, 759 (W.D. Pa. 2016), *aff'd sub nom. Caplan v. L Brands/Victoria's Secret Stores*, 704 F. App'x 152 (3d Cir. 2017) (quoting *Lichtenstein*, 691 F.3d at 311).

To establish a prima facie case of causation, Peticca "must point to evidence sufficient to create an inference that a causative link exists between her FMLA leave and her termination." *Lichtenstein*, 691 F.3d at 307 (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279–81 (3d Cir. 2000)). To show that link, a plaintiff usually identifies "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Budhun*, 765 F.3d at

28

258 (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis,* 480 F.3d 259, 267 (3d Cir. 2007)). When the temporal proximity is not unusually suggestive, the court asks whether "the proffered evidence, looked at as a whole, may suffice to raise the inference." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (quoting *Farrell*, 206 F.3d at 280). The types of evidence a plaintiff may proffer to support an inference of causation include "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." *LeBoon*, 503 F.3d at 232–33 (citing *Farrell*, 206 F.3d at 279–81); *see also Blakney v. City of Phila.*, 559 F. App'x 183, 186 (3d Cir. 2014) ("Absent direct evidence of antagonism, circumstantial evidence may be used to support an inference of antagonism. For example, 'a plaintiff may establish the connection by showing that the employer gave inconsistent reasons for terminating the employee.'") (quoting *Farrell*, 206 F.3d at 280–81).

The Diocese argues that Peticca fails to proffer evidence supporting causation, and that she cannot excuse her poor performance as a cemetery manager by alleging that Tom Brlansky improperly trained her. (Doc. 25, p. 20.) It emphasizes that Peticca had "already availed herself of 8 of the 12 weeks of FMLA leave to which she was entitled" when it terminated her employment almost exactly two months after she took FMLA leave. (*Id.* at 21.) Moreover, it claims a

two-month gap between taking FMLA leave and suffering an adverse employment action is not "unduly suggestive" of retaliation, and because the Diocese immediately granted Peticca FMLA leave when she requested it, there is no "pattern of antagonism," either. (*Id.* at 21 & n.4 (citing *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004) *superseded by statute on other grounds as stated in Robinson v. First State Cmty. Action Agency*, 920 F.3d 182, 187–89 & n.30 (3d Cir. 2019).) The Diocese also continued to pay Peticca's salary until October 2023, so it argues she received her full FMLA benefits and then some. (*Id.* at 21.) Finally, it argues that Peticca testified that she did not know why the Diocese terminated her employment, which suggests that the reason was not retaliatory. (*Id.* at 21–22.)[13]

On the other hand, Peticca argues that the evidence shows both a suggestive temporal proximity and a pattern of antagonism. (Doc. 26, pp. 16–18.) She offers a different framing of the proximity issue. (*Id.* at 17–18.) First, she claims that the two-month gap between when she took FMLA leave and when the Diocese terminated her employment is unduly suggestive. (*Id.* at 17 (citing *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007).) Second, she argues that by complaining

---

[13] Peticca argues that the Diocese makes this argument by taking a statement from her deposition out of context. (Doc. 26, pp. 20–21 ("In such testimony, Peticca was clearly referring to the fact that it did not make sense to her that she was terminated given she *never* received a formal performance write up or similar document prior to her termination.") Drawing all reasonable inferences in favor of Peticca, the court finds that the disputed testimony is not dispositive.

about the "mess" at the gates of heaven cemetery and encouraging Shanabrook and Brlansky to make a list of issues they found there mere days after she took FMLA leave, Kollar and the Diocese scrutinized her performance shortly after she took leave, which suggests causation. (*Id.* at 18–19.) As for a pattern of antagonism, Peticca argues that: (1) at several meetings with Diocese officials she attended while on leave, the Diocese "questioned the nature of her leave and when she would be returning to work"; (2) unlike it did for other employees who took FMLA leave, the Diocese did not immediately provide her STD application paperwork; and (3) again, the Diocese subjected her work to "heightened scrutiny" when she took FMLA leave. (*Id.* at 18–19.)

In reply, the Diocese again argues that the two-month gap between the beginning of Peticca's leave period and her ultimate termination from the cemetery manager position is not unduly suggestive. (Doc. 31, pp. 4–6.) She had already taken two thirds of her FMLA leave, and the Diocese continued to pay her salary for several months after it terminated her employment, undermining her retaliation argument. (*Id.* at 4–5.) Moreover, the Diocese argues that the meeting it held with Peticca focused on the performance issues Shanabrook and Brlansky discovered at the Gates of Heaven Cemetery, not Peticca's invocation of her FMLA rights. (*Id.* at 5–6.)

31

The parties agree that about two months elapsed between the time Peticca took leave and when the Diocese fired her.  (Doc. 25, p. 21; Doc. 26, pp. 17–18.) The court finds that, standing on its own, a two-month gap neither requires nor precludes a finding that Peticca has stated a prima facie case of causation. *Compare Fasold v. Justice*, 409 F.3d 178, 189–90 (3d Cir. 2005) (finding suggestive proximity in a period of more than two months) *with Williams*, 380 F.3d at 760 (holding that a two-month and several-day period was not unduly suggestive).

Peticca presents additional evidence of retaliatory animus.  *LeBoon*, 503 F.3d at 232–33.  For example, Peticca alleges that the Diocese placed her performance as a cemetery manager under greater scrutiny only after she took leave.  Indeed, Kollar asked Shanabrook and Brlansky to compile a list of problems they discovered at the Gates of Heaven Cemetery three days after Peticca took FMLA leave, even though, drawing all reasonable inferences in Peticca's favor, the pair had already covered for Peticca and worked at the cemetery for several weeks before they told Kollar about the problems there and Kollar initiated an investigation.  And Kollar recognized the apparently suspicious timing between the Diocese's investigation of the cemetery and Peticca's request for leave when she emailed Jackson and another colleague in July 2023 and noted: "[k]nowing

[Peticca], she will twist our dismissal to look like we are on a witch hunt just to avoid paying her while she is injured." (Doc. 30-14, p. 2.)

Peticca's argument is also supported by evidence suggesting the Diocese knew about her performance issues long before she took leave and failed to discipline her for some of the same issues listed in her termination notice. The Diocese claims it "discovered" numerous issues at the Gates of Heaven Cemetery while Peticca was on leave, and it terminated Peticca because of her evident poor performance. (Doc. 25, p. 23.) But Peticca provides evidence, like Joseph Brlansky's letter and emails between Kollar and Jackson, that suggests the Diocese knew about several of the performance issues listed on her termination notice years before she took leave. Kollar testified that she visited the Gates of Heaven Cemetery several times between 2020 and 2023. And yet, apart from some performance reviews during her introductory period as a cemetery manager in 2019, between July 2020 and June 2023, Peticca received no performance reviews, performance improvement plans, written discipline, or formal grievances until her meeting with Kollar and Jackson while she was out on leave.

Courts recognize that an employer's decision to increase scrutiny of an employee's performance or attendance soon after the employee takes FMLA leave may support a prima facie case of causation. For example, in *Branch v. Temple University*, the plaintiff argued that his employer "engaged in a 'witch hunt' to find

33

any reason to terminate [him]." *Branch v. Temple Univ.*, 554 F. Supp. 3d 642, 663 (E.D. Pa. 2021).  Two days after the plaintiff employee requested to use FMLA leave, the employer checked "logbooks" that the employee was supposed to sign during his shifts and found that he had failed to sign most of them.  *Id.*  The employer terminated his employment on this basis, even though the employee proffered evidence that the logbook requirement was never enforced.  *Id.* at 651, 663.  The court held that a reasonable jury could conclude that the employer's "decision to check all of [the employee's] logbooks two days after he took FMLA leave, which led to his termination, constituted a period of antagonism directly stemming from [the employee's] protected activity."  *Id.* at 663; *see also Lichtenstein*, 691 F.3d at 307 (holding that an employer's decision to review an employee's call-off records after learning of an FMLA-protected absence could lead a trier of fact to infer that the employer's decision to request the call-off records and later fire the employee was "triggered" by the employer learning about the FMLA-protected absence, thus establishing causation).

Although, unlike in *Branch*, the Diocese waited almost two months to terminate Peticca's employment after she took FMLA leave, the court finds that she has stated a prima facie claim of causation by combining some temporal proximity with other evidence of retaliatory intent.  *See Fasold*, 409 F.3d at 188–90; *Ghalib v. Lycoming Coll.*, No. 4:25-CV-00463, 2025 WL 2713740, at *4

34

(M.D. Pa. Sept. 23, 2025) ("Here, Plaintiff has alleged that in early May 2024 he complained of the alleged discrimination, and by July his hours had been reduced to zero. That falls directly within the temporal proximity that the Third Circuit has found to support an inference of retaliation") (citing *Fasold*, 409 F.3d at 190); *Martin v. Chester Charter Scholars Acad. Charter Sch.*, No. CV 20-2067, 2021 WL 6051444, at *7 (E.D. Pa. Dec. 21, 2021) ("She was fired within two months of returning from leave and two months of requesting additional accommodations. This timing is suggestive.") (citing *Fasold*, 409 F.3d at 189–90).

A reasonable jury could find that Peticca's decision to take FMLA leave was a "'negative factor' that hastened her termination." *Lichtenstein*, 691 F.3d at 311 (quoting 29 C.F.R. § 825.220(c)). Thus, she has stated a prima facie case of FMLA retaliation.

### 2. The Diocese's legitimate reason for termination and Peticca's pretext argument

Because Peticca has established a prima facie case of FMLA retaliation, the burden shifts to the Diocese to provide a legitimate, nondiscriminatory reason supporting its decision to fire her. *Lichtenstein*, 691 F.3d at 302 (quoting *McDonnell Douglas*, 411 U.S. at 802.) The Diocese claims it terminated Peticca's employment because of "a thorough investigation which showed well-documented instances of performance deficiencies and other misconduct, discovered only after Plaintiff went on leave." (Doc. 25, p. 23.)

Peticca does not dispute that this reason satisfies the Diocese's burden. (Doc. 26, p. 19 ("Peticca also clearly identified 'pretextual reasons' for her termination . . . Peticca has established multiple reasons to disbelieve Defendant's articulated 'legitimate reason' for her termination."))  And an employee's poor job performance is a legitimate and nondiscriminatory reason for terminating her employment.  *Ross v. Gilhuly*, 755 F.3d 185, 193 (3d Cir. 2014).  Therefore, the court finds that the Diocese meets its burden at the second *McDonnell Douglas* step.  *See Lichtenstein*, 691 F.3d at 302.

With step two satisfied, the burden shifts back to Peticca, and she "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably disbelieve [the Diocese's] articulated legitimate reasons" to show by a preponderance of the evidence that the Diocese's reasons are pretextual.  *Id.* at 302 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994) (cleaned up)); *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015); *Helwig v. Myers*, No. 3:22-CV-01916, 2026 WL 115832, at *16 (M.D. Pa. Jan. 15, 2026).  There are two ways to demonstrate pretext.  *Willis*, 808 F.3d at 644 (citing *Fuentes*, 32 F.3d at 762).  First, a plaintiff may "point to evidence that would allow a factfinder to disbelieve the employer's reason for the adverse employment action." *Id.* (citing *Fuentes*, 32 F.3d at 765).  Second, a plaintiff may "point to evidence that would allow a factfinder to believe that an invidious discriminatory

36

reason was 'more likely than not a motivating or determinative cause' of the employer's action." *Id.* at 645 (quoting *Fuentes*, 32 F.3d at 764).

Peticca offers two primary pretext arguments.  First, she claims that her FMLA leave period was "used as a period for [the Diocese] to find issues with her performance to justify the decision to terminate her." (Doc. 26, p. 19.)  She argues that Kollar and the Diocese knew of the problems at the Gates of Heaven Cemetery for years and only addressed them, and her performance generally, after Peticca took FMLA leave, which demonstrates pretext. (*Id.* at 19–20.)  Second, she argues that by dismissing her without first progressively disciplining her through methods like performance improvement plans and write-ups, the Diocese failed to follow its own dismissal procedures, which suggests pretext.  (Doc. 26, p. 20.)

In reply, the Diocese argues that it did not use Peticca's FMLA leave period as an opportunity to investigate her; it discovered serious problems at the Gates of Heaven Cemetery for the first time when Shanabrook and Joseph Brlansky covered for Pettica after she took leave.  (Doc. 31, p. 6.)  The discovery sparked the investigation, not Peticca's leave taking.  (*Id.* at 7.)  And it argues that it dismissed her without progressive disciplinary measures because "destroying or failing to report the destruction of cemetery property and overseeing persons being buried in the wrong grave, among other serious transgressions, do not warrant progressive discipline. They warrant immediate termination." (*Id.*)

Peticca presents evidence of inconsistency that precludes summary judgment on the pretext issue. Specifically, the evidence demonstrates that the Diocese knew of her poor performance as a cemetery manager long before Joseph Brlansky and Shanabrook covered for her while she took FMLA leave. Jackson sent Peticca a termination letter with an "employee formal warning form" attached to it on August 11, 2023. (Doc. 30-12, pp. 2–6.) The form listed numerous performance issues including, among others: "unreported damage to a company owned vehicle;" "unreported damage to the premises;" numerous problems with Peticca's grave digging technique; failure to place vaults in the ground correctly; burying an individual in the wrong grave space; failure to collect payment or improperly negotiating burial contracts; "a complete disregard of management structures and authority;" and failing to properly recruit additional employees. (*Id.* at 4–6.)

Again, the Diocese argues that it terminated Peticca in August 2023 because, when she took FMLA leave, it discovered egregious issues at the Gates of Heaven Cemetery. (Doc. 25, p. 23; Doc. 31, pp. 6–7.) But Joseph Brlansky wrote a letter to Kollar in 2020 raising many of the same issues included in the termination notice. Therein, he mentioned Peticca "yelling [at] him that [he] does not know what [he] is talking about," that Peticca "has been corrected for incorrectly digging graves at least 6 times over the last year," a "broken vault" that "occurred because of the same issue" that caused the incorrectly dug graves, and a failure to use

proper "slings." (Doc. 30-6, pp. 2–3.) He also wrote that "[Peticca] has not been in the cemetery industry very long" and that he believed "her not seeking help and or guidance will be a huge detriment [to] her ability to learn and grow. I am honestly unsure if she has followed any instruction or advice I have given to her." (*Id.* at 4.) Kollar testified that Peticca received no formal discipline, nor was she placed on a performance improvement plan or other corrective program, as a result of the events described in the letter.

Joseph Brlansky also testified that he noticed potential problems with Gates of Heaven Cemetery graves while covering for Peticca on a different occasion before she took a leave of absence and FMLA leave, but he did not report them to Kollar. Moreover, some email conversations between Kollar and Jackson, discussed during Kollar's deposition, demonstrate their concerns with Peticca's "insubordination and disrespect," while other conversations lead to a reasonable inference that they were frustrated with Peticca's hiring practices. Despite these issues and those raised in Brlansky's letter, from July 2020 to June 2023, Peticca received no performance reviews, performance improvement plans, written discipline, or formal grievances.

Based on this evidence, a reasonable factfinder could disbelieve the Diocese's reasons for terminating Peticca's employment. *Willis*, 808 F.3d at 644. This is because the evidence suggests that the Diocese knew of many of the

39

performance issues that it claims ultimately led to Peticca's dismissal long before she took FMLA leave, but those issues did not become grounds for dismissal, or even discipline, until after Peticca took FMLA leave. In *Lichtenstein*, the Third Circuit held that summary judgment on the pretext issue was improper for a similar reason. *Lichtenstein*, 691 F.3d at 311. It noted that the employer "was aware of [the employee's] performance deficiencies *prior* to her taking [FMLA-covered leave]. Despite this knowledge, [the employer] did not fire [the employee] until after she took her [FMLA-covered] leave." *Id.* And although the employer provided an alternative explanation for the suspicious timing, the employee presented contrary evidence that raised "significant doubts" about that explanation. *Id.*; *see also Kohls v. Beverly Enters. Wis., Inc.*, 259 F.3d 799, 806 (7th Cir. 2001) (recognizing that a factfinder could infer that "the employee would not have been fired absent her taking of leave" in a hypothetical situation where "a supervisor who had been aware of problems with an employee did not decide to fire the employee until she took leave, and the supervisor based the firing on the incidents of which the employer had already been aware"); *cf. Ross*, 755 F.3d at 194 (holding that an employee did not prove pretext where an employer extended a performance improvement plan to accommodate the employee's leave and that "[a]n employee cannot easily establish a causal connection between his protected activity and the alleged retaliation when he has received significant negative

40

evaluations before engaging in the protected activity") (quoting *Shaner v. Synthes*, 204 F.3d 494, 504–05 (3d Cir. 2000)).[14]

Here, many of the performance issues that the Diocese ultimately used to justify Peticca's firing were known to it long before she took FMLA leave, yet those issues did not warrant discipline until after Peticca took FMLA leave. The Diocese argues that it fired Peticca "based on a thorough investigation which showed well-documented instances of performance deficiencies and other misconduct, *discovered only after Plaintiff went on leave*." (Doc. 25, p. 23 (emphasis added).) Peticca presents evidence that could lead a reasonable trier of fact to disbelieve the Diocese's reason for firing her given that at least some of the specified performance deficiencies were discovered before Plaintiff went on leave.

It is true that, based on the court's review, Peticca has not presented evidence that the Diocese knew about every performance issue and instance of misconduct ultimately listed in the termination notice, such as her failure to bury individuals in the correct grave and damage to the Diocese's truck. However, viewing the facts in the light most favorable to Peticca, the court concludes that summary judgment on the issue of pretext is inappropriate, especially when the

---

[14] As the Third Circuit explained in *Lichtenstein*, the Seventh Circuit in *Kohls* affirmed summary judgment for the employer because the record made clear that the employer did not discover many of the employee's performance issues until after the employee took leave. *Lichtenstein*, 691 F.3d at 311 (discussing *Kohls*, 259 F.3d at 799–806).

Diocese was generally aware of Peticca's poor performance yet took no action nor disciplined her. *See Moorer v. Baptist Mem'l Health Care Sys.*, 398 F.3d 469, 490 (6th Cir. 2005) ("[The employer] was aware of *many* of [the employee's] alleged performance deficiencies prior to his FMLA leave, thereby casting doubt on the timing of the purported reasons for his termination . . . it is undisputed that [the employer] did not intend to immediately fire [the employee] for these deficiencies until it was anticipated that he might take a leave to treat his alcoholism") (emphasis added); *Lichtenstein*, 691 F.3d at 311–12 (quoting *Moorer*, 398 F.3d at 488–90). Therefore, the court will deny the Diocese's motion for summary judgment on Peticca's FMLA retaliation claim.

### C. Breach of contract and WPCL claims

Peticca claims the Diocese breached a unilateral contract formed by its STD insurance policy and employee handbook when it refused to pay her STD benefits. (Doc. 1-2, pp. 12–13.) She also alleges that the STD benefits are wages, and by refusing to pay them out when it fired her, the Diocese violated the WPCL. (*Id.* at 13–14.)

The Diocese argues that neither its employee handbook nor the STD plan create a contract, so it is entitled to summary judgment on both claims. (Doc. 25, pp. 23–26.) In the alternative, the Diocese claims that the STD benefits Peticca

42

seeks are not wages Peticca earned and she lost her eligibility for those benefits when the Diocese fired her.  (*Id.* at 26.)

In response, Peticca argues that the STD plan and employee handbook created a unilateral contract that formed when she continued to perform her duties after reviewing the policies.  (Doc. 26, p. 22 (quoting *Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 941 (Pa. Super. Ct. 2011), *aff'd*, 106 A.3d 656 (Pa. 2014)).  And although an employer may reserve the right to alter an employee's compensation for future services, it cannot alter that compensation retroactively.  (*Id.* at 23.) Therefore, Peticca argues that the employee handbook and STD benefit plan, combined with her continued performance of her job duties, constitute a contract. (*Id.*)  Peticca argues her WPCL claim survives summary judgment for the same reason.  (*Id.* at 24.)

In reply, the Diocese argues that its employee handbook explicitly disclaims any intention to form a contract, and Peticca presented no evidence to suggest that it promised STD benefits apart from its official written policies.  (Doc. 31, p. 8 (noting that, in *Braun*, the employer conceded that its handbook promised specific benefits to employees, whereas the Diocese did not) (citing *Braun*, 24 A.3d at 944).)  Therefore, it argues, no reasonable person could read the handbook or STD policy as expressing the Diocese's intention to be "legally bound by the representations in its Employee Handbook."  (*Id.* at 10.)

The elements of a breach of contract claim under Pennsylvania law are: "(1) the existence of a contract, including its essential terms; (2) a breach of the contract; and (3) the resultant damages." *Doe v. Univ. of Scis.*, 961 F.3d 203, 211 (3d Cir. 2020) (quoting *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016)) (cleaned up). The WPCL sets forth that, when an employer fires an employee, the employer must pay out the employee's "wages or compensation earned" no later than the employee's next regular payday. 43 P.S. § 260.5(a). "A prerequisite for relief under the WPCL is a contract between employee and employer that sets forth their agreement on wages to be paid. Relief under the WPCL is implausible without the existence of a contract." *Giuliani v. Polysciences, Inc.*, 275 F. Supp. 3d 564, 577 (E.D. Pa. 2017) (quoting *Razak v. Uber Techs.*, No. 16-573, 2016 WL 5874822, at *9 (E.D. Pa. Oct. 7, 2016)) (cleaned up).

Thus, both Peticca's breach-of-contract and WPCL claims require the existence of a contract, and this is the element of both claims the parties dispute. (*See* Doc. 26, pp. 21–25; Doc. 31, pp. 8–11.) Peticca is an at-will employee, so her employment on its own does not create the contract necessary to sustain these claims. (Doc. 30-3, p. 48); *Diehl v. Elec. Data Sys. Corp.*, No. CIV.A. 1:07-CV-1213, 2008 WL 2705540, at *3 (M.D. Pa. July 10, 2008). Peticca specifies two provisions within the Diocese's employee documents where she believes the

44

Diocese's intention to form a contract was expressed: the STD benefit plan itself and the Diocese's employee handbook.  (Doc. 26, p. 21.)

Pennsylvania courts recognize that an employee handbook or a benefit plan may be enforceable as a contract against an employer "if a reasonable person in the employee's position would interpret its provisions as evidencing the employer's intent to supplant the at-will rule and be bound legally by its representations" in the relevant document.  *Evans v. Capital Blue Cross*, 269 A.3d 569, 575–77 (Pa. Super. Ct. 2022) (quoting *Bauer v. Pottsville Area Emergency Med. Servs., Inc.*, 758 A.2d 1265, 1269 (Pa. Super. Ct. 2000)) (applying this rule to representations an employer made in a "summary plan description" that described a short-term disability insurance plan run by an employer); *Diehl*, 2008 WL 2705540, at *4–*5 (applying this rule to an employee handbook); *Bauer*, 758 A.2d at 1270 (same); *Hicks v. Glob. Data Consultants, LLC*, 288 A.3d 875, 885 (Pa. Super. Ct. 2022) (applying the rule to commission schedules); *See Braun*, 24 A.3d at 945 ("Instantly, the employee handbook contained Wal–Mart's policies regarding rest breaks, off-the-clock work and meal breaks, policies which were reinforced by Wal–Mart's corporate-wide policies and orientation sessions in which the handbook was disseminated and signed for by the hourly associates, resulting in a unilateral contract between Wal–Mart and the members of the class.") (citing *Bauer*, 758 A.2d at 1269).

45

In most cases, "explicit disclaimers of contract formation in an employee handbook preclude a breach of contract claim." *Braun*, 24 A.3d at 941 (quoting *Caucci v. Prison Health Servs., Inc.*, 153 F. Supp. 2d 605, 611 (E.D. Pa. 2001)); *Martin v. George Junior Republic in Pa.*, No. CIV.A. 15-471, 2015 WL 5472885, at *5 (W.D. Pa. Sept. 16, 2015). Here, the Diocese's employee handbook contains the following disclaimer:

> The contents of this handbook are presented as a matter of information only. While the Diocese of Harrisburg firmly supports the plans, policies and procedures described herein, they are not to be construed as conditions of employment. The Diocese of Harrisburg reserves the right to modify, revoke, suspend, terminate or change any or all such plans, policies or procedures, in whole or in part, at any time, with or without notice. The language used in this handbook is not intended to create, nor is it to be construed to constitute, a contract between the Diocese of Harrisburg and any one or all of its employees.

(Doc. 25-2, p. 142.) The handbook contains a similar disclaimer to the one at issue in *Baron v. Quad Three Group, Inc.*, which the court found "expressly disavowed any intent to contract with its employees pursuant to this employee handbook" and therefore could not create a unilateral contract. 2013 WL 3822134, at *6–*7 (Pa. Super. Ct. Jan. 22, 2013); *see also Martin*, 2015 WL 5472885, at *5 (holding, after analyzing a similar disclaimer, that "no reasonable person could conclude that a contract existed or that Defendants otherwise intended to be bound by the provisions in the Handbook") (discussing *Baron*, 2013 WL 3822134, at *6–*7); *Diehl*, 2008 WL 2705540, at *4–*5 (interpreting a similar disclaimer to preclude a

breach of contract claim); *Engle v. Milton Hershey Sch.*, No. 1:06 CV 010093, 2007 WL 1365916, at *8 (M.D. Pa. Jan. 19, 2007) (same).

Although the court reached the opposite holding in *Braun*, it did so in part because the employer defendant conceded that it made explicit promises to provide the benefits described in its employee handbook. *See* 24 A.3d at 944 ("[The employer's representative] conceded that the employee handbook promised these benefits to employees"); *Martin*, 2015 WL 5472885, at *4 (distinguishing *Braun* on the basis of the promises concession) (citing *Braun*, 24 A.3d at 939, 944). Peticca identifies no similar concession of a promissory offer from the Diocese here, nor does she explain how the Diocese's policies created a promissory offer she then accepted by continuing to perform her duties. (Doc. 26, pp. 21–25.) She argues that "the at-will employment doctrine does not relieve an employer of its contractual obligation to provide the compensation promised in return for an employee's services." (*Id.* at 22.) But she does not explain how a reasonable person could read the handbook or the STD policy to make a promissory offer in light of the disclaimers found therein, and she points to no extra-textual evidence indicating the Diocese's attempt to make a promissory offer. (*See id*); *Braun*, 24 A.3d at 944. Because the Diocese employee handbook contains a clear disclaimer of intent to create a unilateral contract, no reasonable factfinder could find that a

47

reasonable employee could read the employee handbook to create a unilateral contract.  *See Braun*, 24 A.3d at 941 (quoting *Caucci*, 153 F. Supp. 2d at 611).

That leaves the STD policy itself.  The STD policy does not contain the same explicit disclaimer of contractual intent found in the employee handbook. (Doc. 25-2, pp. 132–139.)  But the court reaches the same conclusion about its expression of an intention to form a contractual relationship for several reasons. First, the policy contains the following reservation:

> The Diocese of Harrisburg reserves the right to amend this Plan from time to time and these Amendments can include, but are not to be limited to, changes in the definition of disability, eligibility, benefit periods, and benefit amounts. However, any changes will not change the benefits already being received by any employee/claimant.

(Doc. 25-2, p. 139.)[15]  Reserving the right to modify an agreement at any time, without the consent of the other party, demonstrates that the reserving party does not wish to be contractually bound.  *Barton v. Hewlett-Packard Co.*, 635 F. App'x 46, 48 (3d Cir. 2015).  In *Barton*, the plaintiff argued that the defendant employer breached a contract formed by its sales commission schedules.  *Id.* at 47–48.  The sales commission schedules included a disclaimer similar to the one found in the Diocese's STD policy.  *Id.* at 48.  The Third Circuit explained:

---

[15] Peticca argues that any change to the STD policy contemplated by the disclaimer would only affect future "services after such modification is implemented," and an employer cannot "retroactively modify the terms of an employee's compensation for work performed prior to such modification."  (Doc. 26, p. 23.)  The court finds that this argument could relate to the practical effect of the disclaimer but has little bearing on how a reasonable person would interpret the terms of the policy.

> Here, [the employer] clearly manifested its intention *not* to be bound by the commission rates set forth in the Sales Letter. [The employer] reserved the right to "adjust the terms of the Sales Plan or to cancel it any time"; to "adjust or cancel the terms of Sales plans, or Sales letters with or without notice at any time"; to "change or discontinue" its Global Sales Compensation Policy "with or without notice at any time"; and to decide any dispute regarding commission payments "in its sole discretion." As other courts of appeal have recognized, no contract is formed if an employer retains complete discretion to modify or cancel an employee's commission. This conclusion accords with hornbook Pennsylvania law.

*Id.* (internal citations and footnotes omitted). Therefore, the Diocese's reservation of the right to amend its STD policy at any time demonstrates an intention not to be contractually bound by the policy's language. *See id.*

Moreover, a reservation of a right to amend at any time is a common feature of handbooks and other documents that courts have found not to express an intention to create a contract. *See Diehl*, 2008 WL 2705540, at *4 ("The plan also reserves for EDS 'the right to change, modify, suspend, interpret or eliminate any provision . . . at any time, with or without notice'"); *Baron*, 2013 WL 3822134, at *6 ("The policies, procedures and benefits stated in this manual may be changed at any time at the sole discretion of [the employer]"); *Martin*, 2015 WL 5472885, at *3 ("The employee should be aware that these policies and programs may be amended at any time, and that depending on the particular circumstances of a given situation, the organization's actions may vary from written policy.") The court finds that this clearly stated level of employer discretion belies an intent to be

49

legally bound by the plan.  Nonetheless, the court notes that in *Hicks*, the court held that a commission schedule that specifically stated that the employer "could adjust commission schedules at any time" still formed a unilateral contract through continued employee performance.  288 A.3d at 884–86.  Therefore, although the court finds that the reservation of the right to unilaterally modify the terms of the STD plan belies an intent to create a contract, it is not determinative on its own.

Second, the employee handbook specifically states that "[w]hile the Diocese of Harrisburg firmly supports the plans, policies and procedures described herein, they are not to be construed as conditions of employment."  (Doc. 25-2, p. 142.) The record is not clear as to whether the STD plan is considered part of the employee handbook, but the employee handbook contains a summary of the STD plan, demonstrating that the general disclaimer of contractual intent and of the intention to create conditions of employment extends to the STD plan itself.  (*Id.* at 143.)

Third and finally, although the STD plan and the handbook summary include some of the mandatory language that led the court in *Evans* to hold that a policy expressed contractual intent, it does not raise the possibility of legal action against the Diocese.  (*Id.* at 132–39; Doc. 30-8, at 2–9); *see Evans*, 269 A.3d at 576.  In *Evans*, although the plan at issue gave the employer "full discretion and authority to determine the eligibility for benefits and to construe and interpret all

terms and provisions of [t]he Program[,]" it also explained that "legal action" could be taken against the employer in certain circumstances. *Evans*, 269 A.3d at 571, 576. Based on that section of the plan, the court held that "[t]he fact that legal action can be taken against [the employer] contradicts that it has full and final authority to interpret the terms and provisions of the Program and suggests that [the employer] intends to be legally bound by the [plan]." *Id.* at 576. Here, there is no mention of legal action to challenge the Diocese's authority to change the terms of its plan, including the definitions of important terms like "disability," for employees not yet receiving STD benefits. (Doc. 25-2, pp. 134–139.)

A handbook or other employment document must contain a "clear indication that the employer intended to overcome the at-will presumption" through the representations in the document to support the existence of a unilateral contract, or other evidence of a promissory offer. *Braun*, 24 A.3d at 941 (quoting *Caucci*, 153 F. Supp. 2d at 611.) No reasonable juror could find that a reasonable person in Peticca's position could read the STD policy to create a unilateral contract through continued performance of her duties. Therefore, the court will grant the Diocese's motion for summary judgment on Peticca's breach of contract and WPCL claims. *See Diehl*, 2008 WL 2705540, at *5 ("Having concluded that the short-term plan is not a contract . . . the court finds that [the plaintiff] cannot maintain a Wage Law claim.")

51

### CONCLUSION

The court will deny the Diocese's motion for summary judgment as to Peticca's FLSA, PMWA, and FMLA retaliation claims. It will grant the motion as to Peticca's breach of contract and WPCL claims. An order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: March 16, 2026